# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  August 30, 2019

Mr. Davin M. Reust
Office of the U.S. Attorney
P.O. Box 208
Grand Rapids, MI 49501

Mr. Kenneth P. Tableman
71 Maryland Avenue, S.E.
Grand Rapids, MI 49506-1819

Re:  Case No. 18-2237, *USA v. Michael Clayton*
Originating Case No. : 1:17-cr-00230-1

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Thomas Dorwin

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0223p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL ANTHONY CLAYTON,

*Defendant-Appellant.*

No. 18-2237

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cr-00230-1—Janet T. Neff, District Judge.

Decided and Filed:  August 30, 2019

Before:  SUTTON, GRIFFIN, and READLER, Circuit Judges.

———————————

## COUNSEL

**ON BRIEF:**  Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellant.  Davin M. Reust, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

———————————

## OPINION

———————————

CHAD A. READLER, Circuit Judge.  For over five decades, the Supreme Court's pronouncement in *Miranda v. Arizona* has informed the decision-making process for suspected criminals in the custody of law enforcement.  Chief among the decisions facing a suspect in custody are whether to speak to investigators and whether to seek legal advice.  To inform these choices, *Miranda* requires that a suspect be advised by investigators of, among other things, his

right to "remain silent" and his "right to counsel." *Miranda v. Arizona*, 384 U.S. 436, 444, 473 (1966). Those critical features of *Miranda* ensure that a suspect understands, before being questioned, that he is not required to talk to interrogating officers and that he has the right to consult a lawyer regarding any anticipated interrogation.

Those fundamental aspects of *Miranda* were honored here. All agree that the *Miranda* warning given to Defendant Michael Clayton omitted one element of the traditional warning utilized by the Battle Creek, Michigan Police Department—that a suspect has the right to have his attorney with him "during questioning." But that message was still conveyed to Clayton. In being informed of his right to counsel, Clayton was told that the right begins at the outset, before any questioning. That and the fact that "[n]othing in the words used indicated that counsel's presence would be restricted [during] questioning," undermine Clayton's argument. *Florida v. Powell*, 559 U.S. 50, 63 (2010). We accordingly reject his *Miranda* challenge. We also reject Clayton's challenge to his sentence and **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Michael Clayton was convicted and sentenced to life in prison for sexually exploiting three young women, each of them minors. The allegations against him were disturbing and graphic. Clayton often used drugs to facilitate this abuse. His most frequent victim, J.P., was a vulnerable minor with a drug addiction.

### A. Clayton Sexually Exploits J.P.

From an early age, J.P. struggled to overcome her addiction to drugs. In an effort to kick the habit, she moved away from Michigan. She was only fifteen years old at the time.

J.P. returned to Michigan a year later. Almost immediately, she met Clayton through a mutual friend, H.K., also a minor. Clayton and his friend Ramiro Hernandez met up with J.P. and H.K. one evening at Clayton's house. Clayton asked J.P. her age, and she told him she was sixteen. The group smoked marijuana and drank alcohol. Clayton also supplied the girls with cocaine. And at some point that night, Clayton had sex with J.P.

This pattern of conduct continued over the next two weeks:  Clayton would invite J.P. over to his house, give her cocaine, and have sex with her.  Clayton was clear in his expectations of J.P.: cocaine in exchange for sex.  Clayton recorded the sex acts on his iPhone, often publishing them on Snapchat, a social media application where users can exchange photos, videos, and texts.  In the fourteen days that Clayton knew J.P. he recorded twenty-seven sexually explicit videos of her.

During this same period, Clayton also began introducing J.P. to other men.  The first was Freddie Cruz.  One evening when Cruz arrived at Clayton's home, J.P. was handed a small plate with cocaine on it, which she was told was from Cruz.  Clayton asked J.P. to turn around while the two men commented on her body and negotiated a price.  Cruz then left.

Later that evening, Carlos Duran visited Clayton's home.  As he did with Cruz, Clayton negotiated with Duran a price for J.P.—$100.  Duran then took J.P. to the bedroom and had sex with her while Clayton stood by with a gun.  Clayton kept the money paid by Duran.

One day during this disturbing sequence of events, J.P.'s nose started bleeding, and she asked to take a break from using cocaine.  Clayton became suspicious and asked J.P. why she was stopping.  She told him that she felt sick.  Ignoring her answer, Clayton asked again.  He then left the room.  When he returned, he was holding a gun.  Clayton loaded the gun and gave J.P. specific instructions:  "[O]kay, this is what we are going to do.  I'm going to take this plate of coke and we are going to go in the bedroom and we are going to have sex."  J.P. did as she was instructed.

## B.  Law Enforcement Intervenes, Finding A Terrified J.P. Hidden In Clayton's Basement.

That night, a frightened J.P. texted her father while at Clayton's house.  She was being held against her will, she said, and she believed that her life was in danger.  Fear-stricken, her father called the Battle Creek Police Department, notifying them of J.P.'s texts.

The police and J.P.'s father raced to Clayton's house, and the police announced their presence upon arrival.  Clayton's roommate, Blake Robbins, answered the door.  He told the officers J.P. had left with her friend, H.K., about thirty minutes earlier.  At that moment, J.P.'s

father received another text.  J.P. alerted him that she was still in the house.  The officers stormed inside.  They found Clayton and, with him, a potpourri of criminality: two loaded guns, a set of brass knuckles, cocaine powder, marijuana, and drug paraphernalia. But they could not immediately locate J.P.  Upon reaching the basement, the officers finally found J.P., traumatized and hysterical.  J.P. would later testify that she had been forced into the basement in an effort to conceal her presence.  Officers took J.P. to the hospital, took Clayton and Robbins into custody, and arrested Hernandez not long after.

**C.  While In Custody, Clayton Is Questioned By Law Enforcement.**

When Clayton arrived at the station, officers seized his phone and began questioning him. Detective Sutherland conducted the interrogations.  Before any questioning, Sutherland read Clayton his *Miranda* rights from a standard form used by the Battle Creek Police Department. Sutherland told Clayton:

> Before we ask you any questions, you must understand your rights.
>
> - You have the right to remain silent.
>
> - Anything you say can and will be used against you in court.
>
> - You have the right to talk to a lawyer before we ask you any questions.

| | |
|---|---|
| **Clayton:** | Ok. |
| **Det. Sutherland:** | If you cannot afford to have a lawyer, one will be appointed for you before any questioning if you wish. |
| | Do you understand your rights? |
| **Clayton:** | Yes, sir. |

In giving these warnings, Sutherland misread the third *Miranda* warning concerning the right to counsel.  Sutherland tracked the part of the form that states "[y]ou have the right to talk to a lawyer before we ask you any questions"—but omitted the following clause of the warning—"*and to have him/her with you during questioning*." (emphasis added).  Sutherland offered Clayton the form and asked Clayton to sign it, but Clayton refused.

No. 18-2237                              *United States v. Clayton*                              Page 5

After the interview and a subsequent break, Sutherland interviewed Clayton again.  He did not re-read to Clayton any aspect of the *Miranda* warnings.  Each of the interviews lasted thirty minutes or less.  In neither session did Clayton provide any material statements.

Clayton was interviewed again the following day, this time by Homeland Security Investigations Special Agent Williams and Battle Creek Police Detective Bush.  At the outset of that interview, Williams stated:  "It's my understanding that you were read *Miranda*, and you're good to go.  You still want to talk because this is your lifeline?"  Clayton responded enthusiastically:  "Hell yeah I want to f[***]ing talk."

During the interview, Clayton admitted to having sex with J.P., who he said he believed was seventeen years old, and to producing a Snapchat video of the encounter.  He also claimed that J.P.'s friend, H.K., was responsible for prostituting J.P.  He provided the officers with the password to unlock his cellphone.  During the course of the interview, which lasted about an hour, Clayton claimed he was "freaking out."

After his initial interview with Clayton, Sutherland interviewed J.P.  During the interview, which took place at the hospital, J.P. explained that over the course of two weeks, Clayton repeatedly gave her cocaine, had sex with her, and made sexually explicit recordings of her with his phone, many of which she said were stored on his Snapchat account.  J.P. provided Sutherland with Clayton's username to his Snapchat account.  J.P. also had a physical exam.  Clayton's DNA was found on her underwear and anal/perianal area.

Following this series of interviews, Williams acquired search warrants for Clayton's cellphone, Facebook account, and Snapchat account.  On those platforms, officers found approximately thirty-seven videos of Clayton engaging in sex acts with minors.  J.P. was featured in twenty-seven videos, H.K. in seven, and a third victim, K.P., in three.  Clayton's Snapchat account also contained four videos of him displaying and weighing cocaine and two of him holding a firearm.  In addition to the digital evidence discovered on Snapchat, officers discovered text messages by Clayton and Hernandez discussing the trafficking of J.P.

**D.  Clayton Is Charged With Sexually Exploiting And Trafficking Underage Girls.**

In an eight-count superseding indictment, Clayton was charged with conspiracy to exploit a minor; sexual exploitation of minors J.P., H.K., and K.P.; sex trafficking a minor; conspiracy to distribute cocaine; and being a felon in possession of firearms.  The superseding indictment also charged Hernandez.

Clayton moved to suppress the statements he made during his interviews with Sutherland and Williams and the evidence arising therefrom.  After a hearing, the district court denied Clayton's motion.  The case was then set for a jury trial.

Trial lasted three days.  Over the course of the trial, the government presented substantial evidence against Clayton.  Much of it was directed at Clayton's sexual exploitation of minors:

- J.P. testified about her sexual encounters with Clayton.

- Duran testified that he paid Clayton so that he could have sex with J.P.

- A forensic technician testified that she recovered Clayton's DNA from J.P.'s underwear and genital region.

- Hernandez and J.P. both testified that Clayton took videos of underage girls and uploaded them onto Snapchat.

- H.K.'s mother testified that several Snapchat videos recovered from Clayton's account revealed Clayton sexually exploiting her daughter.

- Sutherland testified about the videos and text messages recovered from Clayton, Robbins, Hernandez, and J.P.'s phones.

- Sutherland described the recordings of the minors performing sex acts, which were found on Clayton's phone and Snapchat account.

The victims of Clayton's sexual misconduct, however, were not limited to J.P. and H.K.  The jury also heard testimony that just a month before he met J.P., Clayton had engaged in similar misconduct with another minor, K.P.  K.P. testified that she was fifteen years old when Clayton reached out to her on Facebook.  She had seen him around Battle Creek, and he knew some of her family.  Over Facebook, Clayton asked K.P. how old she was, and she told him that she was fifteen.  Clayton then invited K.P. to his house.  The first time she visited, they watched a movie.  The second time, Clayton tried to get K.P. to use cocaine, but she refused.  The two had sex, and Clayton recorded the episode.

K.P. visited Clayton five more times.  Each time, they engaged in sex acts, and he recorded them.  Like Clayton's recordings of acts with other minors, videos of K.P. were also found on his phone and Snapchat account.  K.P. kept going back to Clayton, she told the jury, because she was afraid of him.  He would threaten her with a gun and tell her that if she ever left him or refused to have sex with him, he would kill her.  Clayton sent her a video in which he was saying the same thing.

Other evidence detailed Clayton's activities related to drugs and guns.  Among the more significant evidence:  Hernandez and J.P. testified that Clayton sold cocaine and owned guns.  Videos depicted Clayton talking about dealing large quantities of drugs.  And a crime technician testified that he collected cocaine and two firearms from Clayton's house.

**E.  Clayton Is Convicted And Sentenced To Life In Prison.**

Clayton was convicted on all counts.  The ensuing presentence report calculated Clayton's offense level as 53.  The offense level was reduced to 43 in accordance with Chapter 5, Part A of the Federal Sentencing Guidelines, which states that when a total offense level calculation exceeds 43, the offense level is treated as a level 43.  U.S.S.G. ch. 5, pt. A, cmt. n.2.  Clayton's criminal history was calculated as category IV due to his prior convictions for domestic violence, assault, battery, and being a felon in possession of a firearm.

Clayton sought a downward variance on the basis of his history of mental-health issues.  Clayton claimed to exhibit mental-health and behavioral problems throughout his lifetime.  Since a young age, Clayton had received mental-health treatment and social security benefits.  Despite these obstacles, he managed to graduate from high school and attend some college.  In his twenties, Clayton was diagnosed with bipolar disorder and schizophrenia.  But he never consistently took the medications prescribed, claiming they made him feel like a "zombie."  Clayton claimed these mental-health issues made him susceptible to manipulation by the other defendants and the victims.  Acknowledging all of this, the district court nonetheless denied Clayton's request for a downward variance.

Clayton's criminal history combined with the seriousness of his multiple sexual-exploitation offenses resulted in a Guideline calculation of a sentence of life imprisonment.  The

district court addressed the relevant sentencing factors under 18 U.S.C. § 3553(a).  When considering the nature of the offense and the need for deterrence, the court highlighted the seriousness of Clayton's conduct, which the court characterized as a "horrendous, drug fueled, weapon heavy nightmare."  By contrast, it considered but did not credit Clayton's claim that his mental-health problems made him susceptible to the victims' manipulation.  Pronouncing Clayton's conduct as some of the worst it had seen in over a decade on the bench, the district court sentenced Clayton to life in prison.  While serving that sentence, the district court recommended that Clayton receive mental-health treatment.

## II.  ANALYSIS

Clayton's appeal primarily turns on his invocation of *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  He argues he was not properly apprised of his right to the presence of an attorney during police interrogation, as required by *Miranda*.  It follows, he says, that his admissions to law enforcement and any physical evidence obtained therefrom should have been suppressed. He also argues that his sentence was both procedurally and substantively unreasonable.  We reject each of his arguments.

### A.  Clayton Properly Received And Waived His *Miranda* Rights.

From its familiar case-law pedigree to its popularized usage across cinema and television, the general contours of the "*Miranda* warning" are well-known.  While we sometimes struggle to name high-ranking government officials or even the three branches of government, *see Americans are poorly informed about basic constitutional provisions*, Annenberg Pub. Pol. Center (Sept. 12, 2017), https://cdn.annenbergpublicpolicycenter.org/wp-content/uploads/2017/09/Civics-survey-Sept-2017-complete.pdf ("Only a quarter of Americans (26 percent) can name all three branches of government."), many undoubtedly can name one or more of the four warnings an officer must give before questioning a suspect in custody.  They are:  (1) you have the right to remain silent, (2) anything you say can be used against you in a court of law, (3) you have the right to the presence of an attorney, and (4) if you cannot afford an attorney, one will be appointed for you before any questioning if you would like.  *Miranda*, 384 U.S. at 479.

No. 18-2237                    *United States v. Clayton*                    Page 9

At issue today are *Miranda*'s third and fourth warnings:  You have the right to the presence of an attorney, and if you cannot afford an attorney, one will be appointed prior to any questioning if you would like.  *Id.*  In advising suspects of their *Miranda* rights, officers of the Battle Creek Police Department customarily would read from a standard form that followed the traditional *Miranda* warning.  Police investigators told Clayton the following:  "You have the right to talk to a lawyer before we ask you any questions. . . . If you cannot afford to have a lawyer, one will be appointed for you before any questioning if you wish."  That warning did not track completely Battle Creek's standard warning.  It omitted the phrase: "and to have him/her with you during questioning."

Sutherland also provided Clayton with a copy of the Battle Creek form, which accurately described his *Miranda* rights.  In the absence of a proper verbal *Miranda* warning, receipt of the proper warning in writing might itself be sufficient to inform a suspect of his *Miranda* rights, even if he does not sign the form (and Clayton did not).  *See, e.g.*, *United States v. Adams*, 583 F.3d 457, 467–68 (6th Cir. 2009) (internal citations omitted).  All that is required is that the suspect be informed of his *Miranda* rights.  But the record here is unclear whether Clayton read the form he was offered.  So we are left with the question:  Was the verbal warning given to Clayton nonetheless sufficient to convey *Miranda*'s command with respect to the right to counsel?

It was.  While the officer in question would have been better served to read the entire *Miranda* instruction, we do not require any specific formulation of those rights.  What we require is a warning that reasonably conveys the rights at issue.  *Florida v. Powell*, 559 U.S. 50, 60 (2010) (noting that the "Court has not dictated the words in which the essential information must be conveyed") (citing *California v. Prysock*, 453 U.S. 355, 359 (1981) (per curiam)).  With respect to *Miranda*'s third and fourth warnings, one way or another, a suspect must be advised that he has the right to consult counsel, before any questioning, and regardless whether he can afford one.  Here, these goals were achieved.

1.  *A Suspect's* Miranda *Rights Must Be Reasonably Conveyed.*

*Miranda*'s warnings aim "to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010).  With respect to the right to counsel specifically, *Miranda* defines that right to include both "the right to consult with a lawyer and to have the lawyer with [you] during interrogation." 384 U.S. at 471.

Warnings need not be formulaic.  *Powell*, 559 U.S. at 60; *Duckworth v. Eagan*, 492 U.S. 195, 202–03 (1989); *Prysock*, 453 U.S. at 359–60.  Indeed, there is no "talismanic incantation" officers must follow.  *Prysock*, 453 U.S at 359.  Rather, what officers must do is warn a suspect in a manner that, to invoke a baseball analogy, "touch[es] all of the bases" reasonably to convey to a suspect his rights under *Miranda*.  *Duckworth*, 492 U.S. at 203.  With some play in the joints, courts should not "examine *Miranda* warnings as if construing a will or defining the terms of an easement."  *Id.*  Instead, our test is a practical one:  Would a suspect hearing the warnings reasonably understand his options regarding interrogation?

Making that practicality inquiry, however, is not without its challenges.  By way of background, when the Supreme Court embarked down the path of required *Miranda* warnings, it expected this approach would "obviate[] the need for a case-by-case inquiry into the actual voluntariness of the admissions of the accused."  *Prysock*, 453 U.S. at 359 (citation omitted).  But one case-by-case inquiry replaced another.  Today, courts are often asked to decide whether variations of the *Miranda* warning are constitutionally sufficient.  So rather than inquiring into the circumstances surrounding a particular defendant's interrogation, as was the case pre-*Miranda*, courts now engage in linguistic exercises over the hypothetical prejudice caused by a variation in some aspect of the warning.  *See, e.g.*, *United States v. Crumpton*, 824 F.3d 593, 605–06 (6th Cir. 2016) (finding sufficient a warning that informed a suspect of his right to remain silent and that failing to do so would result in his statements being used against him even without the phrase "in court").  That being the case, we now take up this linguistic examination.

    2.  *To Be Valid,* Miranda*'s Instruction Regarding The Right To Counsel Must Be Understood From A "Commonsense Reading" Of The Warning Given To The Suspect.*

With respect to the right-to-counsel aspects of *Miranda*, the Supreme Court in *Florida v. Powell* clarified what type of warnings sufficiently convey that right to an individual in custody. 559 U.S. at 60–63.  In *Powell*, a Florida police officer told a suspect:  "You have the right to talk to a lawyer before answering any of our questions.  If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning.  You have the right to use any of these rights at any time you want during this interview."  *Id.* at 54.  The Florida Supreme Court deemed this warning misleading because it interpreted "before questioning" as imposing a time limit on the right to counsel.  *Id.* at 55.  That phrasing, the Florida Supreme Court concluded, erroneously suggested that the suspect (Powell) could consult with an attorney only "before" the interrogation started.  *Id.*  "Before" was thus said to define both the beginning—and end—to the right's duration.  *Id.*

The Supreme Court disagreed.  The warning, it explained, made clear the seminal right at stake—"the right to talk to a lawyer."  And when the entire instruction was "given a commonsense reading," the warning effectively "communicated that the right to counsel carried forward to and through the interrogation . . . ."  *Id.* at 63.  Nothing in the warning, the Supreme Court observed, indicated that the right expired once questioning began.  *Id.* at 62.  The phrase "before any questioning," which had troubled the Florida Supreme Court, was seemingly misconstrued by that court.  These warnings, said the Supreme Court, merely indicated when that right began, not how long it lasted.  *Id.*

Other aspects of the warning further confirmed that Powell was sufficiently advised of the comprehensive nature of his right to counsel.  The warning at issue in *Powell* included a "catchall" provision informing the defendant that he had the right to "use any of these rights at any time you want during this interview."  *Id.* at 55.  Read together, the warnings stated that a suspect had the right to talk to a lawyer before any questions and that he could invoke that right at any point, including during questioning.  *Id.* at 62–63.  Of course, "[d]ifferent words were used in the advice Powell received" when compared to *Miranda*'s precise formulation.  *Id.* at 64.  But, it bears noting, "they communicated the same essential message."  *Id.*

For these reasons, the instruction in *Powell* was not likely to confuse a reasonable listener. To conclude that the right to counsel during questioning did not exist based upon the language used in *Powell*'s warning, the Supreme Court reasoned, would be "to imagine an unlikely scenario." *Id.* at 62. After all, the right to counsel "at any time" would naturally include during any questioning or other interrogation. *Id.* Concluding otherwise would be "counterintuitive." *Id.* It would require a scenario where the suspect would need "to hop in and out of the holding area to seek his attorney's advice" between questions. *Id.*

3. *Clayton's Warning Regarding The Right To Counsel Satisfied* Powell*'s "Commonsense Reading" Standard.*

In approving of the instruction given to the suspect by Florida police officials, *Powell* largely resolves the issue before us today. Sutherland told Clayton that he had "the right to talk to a lawyer before we ask you any questions . . . [and] [i]f you cannot afford to have a lawyer, one will be appointed to you before questioning if you wish." Clayton was thus informed, as was the suspect in *Powell,* that he had the right to consult with an attorney, as required by *Miranda*, and that the right began immediately, before any questions may be asked. That "reasonably conveyed [Clayton's] right to have an attorney present, not only at the outset of interrogation, but at all times." *Id.* at 62.

As in *Powell*, this phrasing was enough to communicate "the same essential message" as the warnings approved in *Miranda*. *Id.* at 64. In fact, the warning Clayton received was in some respects more comprehensive than the warning in *Miranda*. *Miranda*, it bears reminding, merely required that a defendant be informed of his right to "the presence of an attorney." 384 U.S. at 479. To be sure, *Miranda* clarified that "presence" includes the right to consult with an attorney before and during questioning. But *Miranda* did not require a warning exactly to that effect. Case in point: *Miranda* acknowledged that the warnings employed by the FBI at the time of its decision were "consistent with the procedure which we delineate today." *Id.* at 483–84. And those warnings, while advising of the right to counsel, conspicuously did not state expressly that counsel may be present during interrogation. *See id.* at 500–01 n.3 (Clark, J., dissenting).

That Clayton was informed of a right to counsel "before questioning" (but not given the same express direction for the period "during questioning") does not change our conclusion.

Here again, we lean on *Miranda*, which approved of virtually the same phrasing in its parallel use of the word "prior." "Prior to any questioning" was the way *Miranda* articulated the right to appointed counsel. *Id.* at 479. *Miranda* itself treated "prior" as an indication of the right's starting point, not its end. So too for the word "before."

It's true that the warnings in this case did not contain the same kind of catchall phrase as the warnings in *Powell*. 559 U.S. at 54–55 (defining the "catchall" warning as: "[y]ou have the right to use any of these rights at any time you want during this interview" (alteration in original)). But that does not change the result here. Like his right to talk to an attorney "before we ask you any questions," the officers told Clayton of his right to have an attorney appointed "before any questioning." This context helps show that the "before" language is triggering in both instances, rather than limiting. It would be "counterintuitive" to think that both rights kicked in before questioning but terminated the moment the officer started the interrogation. *Id.* at 62. That's especially true given that *Miranda* and *Powell* read similar language ("prior to" and "before") as triggering. And, as far as we can tell, since *Powell*, no court of appeals or state Supreme Court has found this formulation wanting.

Our decision here finds itself in good company, and not just the company of *Miranda* and *Powell*. A year after *Powell* was decided, the Florida Supreme Court read *Powell* the same way we do today. In *Rigterink v. State*, the court upheld a warning where the defendant was told he had the right to an attorney "present prior to questioning." 66 So. 3d 866, 884 (Fla. 2011). The Florida Supreme Court found that the use of "prior to" was the same as "before" and merely indicates when the right to counsel begins. *Id.* at 892–93.

Since then, both the Third and Fourth Circuits have upheld warnings less fulsome than the one Clayton received. Those courts found that the bare warning "you have the right to an attorney," without any clarifying language, was enough to satisfy *Miranda*. *See United States v. Warren*, 642 F.3d 182, 185–87 (3d Cir. 2011); *United States v. Nash*, 739 F. App'x 762, 765 (4th Cir. 2018) (per curiam). In neither instance was the right-to-counsel warning fatally undermined by the absence of an express reference to the right to counsel *during interrogation*.

No. 18-2237                          *United States v. Clayton*                          Page 14

And consider one other aspect of *Warren*.  As just explained, the right-to-counsel warning there did not contain any qualifying language.  But the fourth right—the right to appointed counsel, if the suspect cannot afford one—did.  It tracked the language in *Miranda*: "If you cannot afford to hire an attorney, one will be appointed to represent you without charge *before any questioning*."  *Warren*, 642 F.3d at 184 (emphasis added).  That language, the Third Circuit noted, merely indicated when the right to appointed counsel would start.  *Id.* at 186.  It did not serve to cabin that right to the period before questioning.  The same is true here with respect to Clayton's instruction regarding the right to counsel *before questioning*.

\*      \*      \*      \*      \*

A few final thoughts.  One can fairly argue what particular instruction might best convey a defendant's *Miranda* rights.  Clayton has his view, and he may well be correct.  But that type of debate is reminiscent of the formalistic quibbling criticized in *Duckworth*, *Prysock*, and *Powell*.  As those cases instruct, courts are not in the business of dictating the "precise formulation of the warnings given a criminal defendant."  *Prysock*, 453 U.S. at 359.  Nor are courts looking to crown the best formulation, declaring all others deficient.  *Powell*, 559 U.S. at 63 ("Although the warnings were not the *clearest possible* formulation of *Miranda's* right-to-counsel advisement, they were sufficiently comprehensive and comprehensible when given a commonsense reading.") (emphasis in original).  Our job is simply to ask whether a "commonsense reading" of the actual language employed meets the aims of *Miranda*.  *See id.* at 64 (noting that in the *Miranda* context, "[d]ifferent words" can "communicate[] the same essential message").

That is not to say interrogating officers need not sweat the details.  We reiterate what *Powell*, *Warren*, and many others have said before.  Officers are expected to take the necessary steps to properly Mirandize a suspect.  Skirting the edges puts the issue in our hands, not those of the interrogators, as today's case reflects.  On this point we note agreement from the United States.  In its brief in *Powell*, it identified the same concerns and cautioned: "[P]olice can significantly reduce the risk that a court will later suppress the suspect's statement on the ground that the advice was inadequate."  *Id.* at 64 (quotations omitted).  Here, an officer decided not to

read the form he held in his hand, opting instead to recite the warnings from memory.   His memory failed him, leaving the ensuing prosecution subject to a Fifth Amendment challenge.

In the end, these warnings sufficiently advised Clayton of the scope of his right to counsel.   In the world of *Miranda*, substance controls form.   And here, the substance passes constitutional muster.

*4.   Clayton's Statements Were Voluntary.*

Regardless whether he was properly Mirandized, Clayton contends that his statements were nonetheless involuntary, making them and their fruits inadmissible.   To determine whether a defendant's statement was voluntary, we ask the following three questions:   "(1) Was the police activity objectively coercive? (2) Was the coercive activity sufficient to overbear the defendant's will? and (3) Was 'the alleged police misconduct . . . the crucial motivating factor in the defendant's decision to offer the statement'?"   *United States v. Scott*, 553 F. App'x 555, 558 (6th Cir. 2014) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).   Relevant factors in this inquiry include the defendant's age, education and intelligence, his previous interactions with the criminal justice system, the length and extent of questioning, and the use of physical coercion such as deprivation of food or sleep.   *See Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (citations omitted) (examining these factors as part of the totality of the circumstances surrounding the making of the statements at issue).

Measured on this scale, there is little to suggest Clayton's statements were anything but voluntary.   Clayton has a high-school education and attended some college; he was able to understand the situation he was in and what was being asked of him.   When asked if he wanted to speak to Williams, Clayton declared:   "Hell yeah I want to f[***]ing talk."   During questioning, Clayton had the opportunity to respond freely.   He used that opportunity to place the blame on others, minimizing his own involvement.   Altogether, he was questioned for only about two hours, first by Sutherland, then by Williams, with a significant break in between.   And this was not unfamiliar territory for Clayton, given his previous charges and convictions.   In sum, we see no evidence of coercion.

Clayton disagrees. He portrays as a form of coercion the fact that Williams offered him a "lifeline." But that "offer" was seemingly nothing more than a suggestion that Clayton might receive some leniency if he cooperated, a practice that is generally permissible. *See, e.g.*, *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005). Yes, Clayton may also have been "freaking out." But that would likely be true of anyone who finds himself the subject of possible criminal charges—particularly ones as serious as those Clayton faced. And while Clayton has some history of mental-health issues, nothing about his interrogation suggests he did not understand the questions posed or that he otherwise acted in a concerning manner.

Our final tally: Clayton received sufficient *Miranda* warnings, his statements to law enforcement were made voluntarily, and those statements and the related physical evidence were properly admitted. Clayton's conviction thus stands.

## B. Clayton's Sentence Was Not Procedurally Unreasonable.

Turning from his conviction to the sentence imposed for that conviction, Clayton claims that his within-Guidelines life sentence was procedurally unreasonable.

In considering whether a sentence is procedurally unreasonable, our focus lies on how the sentence was calculated. We ask whether the district court properly calculated the Guidelines range, remembered to treat that range as advisory, and considered the sentencing factors in 18 U.S.C. § 3553(a) while refraining from considering impermissible factors. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). To satisfy our procedural reasonableness inquiry, the district court must have sufficiently explained its sentence and may not have selected a sentence based upon facts that are clearly erroneous. *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019), *petition for cert. filed*, (U.S. July 2, 2019) (No. 19-5123). Ordinarily, we would review Clayton's claim of procedural unreasonableness for an abuse of discretion. *Id.* But because Clayton did not object during sentencing, we review his claim only for plain error. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc).

Clayton's claim falls short either way. In all respects, his life sentence was procedurally reasonable. The sentence was within the Guidelines range. The district court treated that range

as advisory.  It considered all of the § 3553(a) sentencing factors.  And it sufficiently explained its sentence.

Clayton has two objections, each stemming from the district court's treatment of his mental-health history.  One, the district court failed to grant his request for a downward variance based upon his mental-health challenges.  And two, the district court failed to explain why it also rejected Clayton's mental-health issues.  According to Clayton, his history of "mostly low level" felonies is attributable to his upbringing and longstanding mental-health issues.  Those mental-health issues, he adds, allowed him to be manipulated by the other defendants and the victims here.  On these grounds, Clayton claims entitlement to a shorter sentence.

Our scope of review, however, is not that encompassing.  In the context of a procedural reasonableness challenge, we ask only whether the district court understood its discretion to vary downwards and whether it adequately addressed Clayton's mental-health issues raised in that motion.  *See Rayyan,* 885 F.3d at 440.

 The district court hit each of these marks.  The district court noted Clayton's mental-health-based arguments and then adequately addressed them.  It acknowledged Clayton's mental-health history but ultimately did not find that it justified a variance.  And the court firmly rejected Clayton's contention that he was manipulated by others, including his victims.  The district court was blunt in its assessment of the latter argument, finding it "almost laughable to try to place blame on these young girls who were so susceptible to Mr. Clayton's behavior, to seek out and to exploit them."  Procedural reasonableness simply requires that a district court sufficiently explain its reasoning to allow for reasonable appellate review.  *United States v. Dexta*, 470 F.3d 612, 614–15 (6th Cir. 2006).  As the district court demonstrated its consideration of these issues, we see no procedural error here.

## C.  Clayton's Sentence Was Not Substantively Unreasonable.

Clayton lastly asserts that his sentence was also substantively unreasonable.  In contrast to procedural reasonableness, substantive reasonableness focuses on the length of the sentence.  Our inquiry is one Goldilocks may well appreciate.  We look at whether a "sentence is too long (if a defendant appeals) or too short (if the government appeals)."  *Rayyan*, 885 F.3d at 442.  In

so doing, we ask whether the district court balanced the § 3553(a) factors correctly or if it placed too much weight on some factors, not enough on others.  *Id.*

Our standard of review is deferential.  We ask whether the district court abused its discretion in setting the sentence.  *Parrish*, 915 F.3d at 1047.  We give considerable deference to a district court's decision about the appropriate length, and we treat within-Guidelines sentences as presumptively reasonable.  *Id.*; *see also United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008).

The district court did not abuse its discretion when balancing the § 3553(a) factors.  The court considered the nature and circumstances of the offense as well as Clayton's personal and criminal history.  The court described the offense as a "horrendous, drug fueled, weapon heavy nightmare."  It added that Clayton had a lengthy criminal history that included past violence but also that he had some history of mental-health issues.  The court next considered the need to promote respect for the law and to impose a sentence that reflects the seriousness of the offense as well as the need to provide just punishment for the offense, deter similar criminal conduct, and protect the public from further crimes of the defendant.  There must be punishment, the court observed, to deter the defendant and others from engaging in this kind of behavior.  Specifically, the court identified the need "to protect the public from further crimes of this man."  We see no evidence that the district court gave too much weight to any one of these factors.

Clayton takes issue with the district court's characterization of his conduct as some of the worst it had seen in over a decade on the bench.  Clayton claims this is hyperbole, proving the substantive unreasonableness of his sentence.  In his mind, this statement reflects that the district court was blinded by the need for deterrence in setting the sentence, to the exclusion of the other sentencing factors.  Clayton is correct that the district court did not mince words in describing the severity of Clayton's conduct.  Yet, as just explained, Clayton's sentence was imposed after a balancing of this *and* other § 3553(a) factors, a balancing the district court satisfactorily explained.

But, says Clayton, his conduct cannot possibly be some of the worst that the district court has seen.  Take his criminal history category of IV, he says.  It falls short of the maximum

category, VI.  Surely, says Clayton, the district court sentences numerous defendants with worse criminal history categories every year.

That may be.  But criminal *history* is an odd thing to highlight when the primary consideration at sentencing is the nature of the most *recent* criminal activity, activity the district court found particularly appalling.  That conclusion was reinforced by the Guidelines calculation of Clayton's offense level.  That calculation was so great it made his criminal history category irrelevant:  His calculated offense level of 43, ten points lower than Clayton's actual offense level, yielded a lifetime sentence recommendation no matter the criminal history category. U.S.S.G. ch. 5, pt. A.

A life sentence is severe punishment.  But Clayton's conduct was similarly severe, both now and before.  Clayton's past includes convictions for domestic violence and assault.  Now he has added sex trafficking—of a minor—and creation of over three dozen child-pornography videos.  And recall what each of these videos shows:  Clayton having sex with girls he knew were minors, some of whom were drugged and intoxicated, each of whom he exploited on social media for his own gratification, and, regrettably, each of whom will long bear the weight of these crimes.  We cannot say the district court unreasonably sentenced Clayton for these acts.  Clayton has thus not rebutted the presumption that his within-Guidelines sentence was reasonable.  *See United States v. Lapsins*, 570 F.3d 758, 774 (6th Cir. 2009).

## III.  CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 18-2237

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

    v.

MICHAEL ANTHONY CLAYTON,

    Defendant - Appellant.

> **FILED**
> Aug 30, 2019
> DEBORAH S. HUNT, Clerk

Before:  SUTTON, GRIFFIN, and READLER, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk